IN RE INTEREST OF R.W., A CHILD UNDER 18 YEARS OF AGE.
STATE OF NEBRASKA, APPELLEE, V. T.W. AND L.W., APPELLANTS.
461 N.W.2d 545

Filed October 19, 1990.    No. 90-130.

Charles F. Fitzke, Scotts Bluff County Public Defender, for appellants.

Sara J. Olsen, Deputy Scotts Bluff County Attorney, for appellee.

G. Kirk Meade, guardian ad litem, of Nichols, Douglas, Kelly and Arfmann, P.C.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

WHITE, J.

The parents of R.W. appeal the order of the Scotts Bluff County Court, sitting as a juvenile court, which terminated their parental rights to R.W. The lower court found that the State had shown by clear and convincing evidence that the parents had neglected R.W. The parents assign as error the trial court's alleged denial of their due process rights and its finding that the State had proved by clear and convincing evidence that parental rights should be terminated. We affirm.

In an appeal from a judgment terminating parental rights, this court reviews factual questions de novo on the record, and we are required to reach a conclusion independent of the trial court's findings. Where the evidence is conflicting, the Supreme Court will consider and may give weight to the fact that the trial court observed the witnesses and accepted one version of the facts over another. *In re Interest of A.B. et al., ante* p. 220, 460 N.W.2d 114 (1990); *In re Interest of V.M.,* 235 Neb. 724, 457 N.W.2d 288 (1990).

The record shows that a juvenile court petition was filed on April 13, 1989, alleging that R.W., born October 31, 1984, is a person within Neb. Rev. Stat. § 43-247(3)(a) (Reissue 1988) and that R.W.'s parents "neglect or refuse to provide proper or necessary subsistence or other care necessary for [his] health or well-being." At the hearing on April 20, 1989, the public defender was appointed to represent the parents and an adjudication hearing was set for May 16. The court ordered that R.W. remain in foster care in the custody of the Nebraska Department of Social Services and withheld ruling on visitation pending a separate hearing.

On July 14, 1989, the court found the allegations in the petition to be true, ordered a home study and case plan, and set a hearing on temporary custody and visitation for August 28.

The Department of Social Services retained custody, and on September 15 the court ordered supervised weekly visitation and ordered a report be made on the success in bonding between the parents and R.W.

A motion to terminate parental rights was filed by the State on October 10, alleging that the parents had substantially and continuously or repeatedly neglected R.W.

Following a hearing, the court suspended visitation while the parents were incarcerated in the Scotts Bluff County Jail. On January 4, 1990, the court terminated parental rights, finding that the State had shown by clear and convincing evidence that the parents had neglected and refused to give R.W. necessary parental care and protection. The parents offered little explanation for their actions, but the court found that R.W. had been struck by the parents and that food was withheld at times as some type of family discipline. Both parents were subsequently convicted of felonies as a result of a criminal child abuse prosecution.

The child verbalized fears of his parents and indicated a desire not to return home. Expert testimony at the termination hearing on December 12 and 14, 1989, also showed that there was little or no bonding between the parents and the child. The court held that because "a court-imposed family reunification against the child's will would be contrary to the law and certainly not in this child's best interests," the "only reasonable alternative is to terminate parental rights and place the child in a permanent home so that he may establish new family ties."

The parents' first assigned error asserts that the county court deprived them of due process in several respects: by denying visitation pending the adjudication hearing, by requiring psychological evaluations of the natural parents but not of the foster parents, by failing to enforce the separation of the juvenile court proceedings and the criminal proceedings, by proceeding against the parents without ascertaining whether they understood the proceedings, by allowing the guardian ad litem to prosecute the parents, and by openly favoring the

contentions of a hostile guardian ad litem. Their second assigned error contends that the county court erred in terminating parental rights when the evidence was less than clear and convincing.

We find no deprivation of due process in the proceedings against the parents. The record shows that the parents were informed, both at the initial appearance in the criminal case and at the initial appearance in the juvenile court proceedings, of their rights to remain silent, to an attorney, and to testify and present evidence. The parents were also informed of their rights to a speedy adjudication and to a preliminary hearing and speedy trial. They were informed of the possible penalty for the criminal charge, and the court explained that the prosecutor must prove the allegations in the juvenile petition by clear and convincing evidence. The parents were informed that the court could require them to attempt rehabilitation and that if they failed, their parental rights could be terminated. The public defender was appointed to represent them in both cases. Under state law, when a petition alleges a juvenile to be within the provisions of § 43-247(3)(a), the court shall inform the parents or custodians of their rights. Neb. Rev. Stat. § 43-279.01(1) (Reissue 1988). No indication was given that the parents did not understand their rights or the possibility of the termination of parental rights.

Visitation was initially denied only until the court could obtain expert testimony on the effect of such visitations upon the child. At a July 14, 1989, hearing, the social worker testified that R.W. had been insistent in stating that he did not want to visit his parents. The court scheduled an evidentiary hearing and placed the burden on the State to demonstrate, through evaluations or other expert evidence, that the parents should not have visitation.

Michael Slosnerick, a psychologist with Panhandle Mental Health, testified at the August 28 visitation hearing that he had met with the parents and had no difficulty communicating with L.W., the mother, who is from Korea and speaks English fairly well but with an accent. Slosnerick testified that, based on his personal observations and the interpretation of previous psychological testing, T.W., the father, showed no major

psychosis or evidence of a thought disorder. No previous tests were available for L.W., but he said she showed no indication of problems with hallucinations, thought processes, or depersonalization. The psychologist testified that the parents repeatedly stated that they had done nothing wrong and believed they were being treated unfairly. T.W. and L.W. said they would not alter their actions if they had them to do over again, Slosnerick said.

The psychologist also observed the parents and R.W. in a controlled situation. Slosnerick reported that when R.W.'s parents first entered the room, R.W. was nonresponsive and did not go to them until they showed him some toys. Slosnerick said R.W. interspersed statements about the toys, such as "Here's my car," or "Are these mine?" with statements directed to his parents, such as "I don't like you." R.W. also stated that he did not want to visit with his parents again.

Slosnerick recommended that the court act cautiously on visitation because there appeared to be no bonding between the child and the parents.

We find no error on the part of the trial court in denying visitation pending the separate hearing or in denying it based on the testimony at the evidentiary hearing.

The parents also object because the criminal case was heard by the court immediately after the initial hearing on the juvenile matter. We see no irregularity here, because both proceedings were initial appearances. The judge made it clear that he would not be able to conduct both proceedings, but that another judge would handle the criminal case.

Nor did a due process violation occur at the initial interview with the police or at any later hearing. When the parents were interviewed by an officer of the Scottsbluff Police Department on the evening their son was removed from the home, they were informed of their rights and signed rights advisory forms. Both agreed to speak with the police without an attorney. They were represented by counsel at subsequent court proceedings.

The parents also argue that the court erred by allowing the guardian ad litem to act as a prosecutor and that the court openly favored the contentions of a hostile guardian ad litem. At the December 12, 1989, hearing, the parents' counsel

objected to questioning by the guardian ad litem, suggesting that the guardian was acting as a prosecutor of the parents. The trial court overruled the objection, noting that the guardian is entitled to ask questions. We find no error in the trial court's holding. While state law dictates that a guardian ad litem is not appointed to prosecute or defend the parents, Neb. Rev. Stat. § 43-272.01(2)(b) (Reissue 1988), the guardian "may present evidence and witnesses and cross-examine witnesses at all evidentiary hearings," § 43-272.01(2)(e). R.W.'s guardian ad litem had been cross-examining earlier witnesses. The objection was made when the guardian was cross-examining L.W., who had been called as a witness by the parents' counsel, thus opening the door for the county attorney and the guardian ad litem to cross-examine her. We find no error in allowing this questioning. No due process violations occurred in this case.

We also find no error in the trial court's termination of parental rights based on clear and convincing evidence. The record is replete with examples and testimony of the neglect and abuse to which R.W. was exposed by his parents.

On April 11, 1989, Officer Nancy Paetow of the Scottsbluff Police Department received a phone call from R.W.'s grandmother expressing concern about his well-being. Paetow and another officer visited the home the next day, explaining to the mother that they wished to check on R.W.'s condition. The mother was initially evasive, but allowed Paetow to examine the child. Paetow said she noticed that R.W.'s ribs were obvious, that his stomach was bloated and extended, that he had injuries to his buttocks and a bruise on his cheek, and that he was lethargic. She said that R.W.'s feet were swollen and purplish, with scabs and wounds, and that the large toenails were twisted and deformed. The mother explained that R.W. was losing weight, but that she did not know why; that the wounds on his back were carpet burns; and that his feet were frostbitten because he wets the bed and his feet get cold.

Paetow told L.W. that she wished to take R.W. with her to the hospital, and the mother said she would get him ready. When she heard a clinking noise, Paetow went to check and found L.W. in the kitchen rapidly spooning baby food into R.W.'s mouth. At the hospital, R.W. told Paetow that he was

hungry. He ate a sandwich, salad, milk, and ice cream, and Paetow said she became concerned about his becoming ill from having consumed too much food too quickly.

Patricia Pester, a Child Protective Services worker for the State who met Paetow and R.W. at the hospital, described R.W. as being very small for his age, about the size of a 2½-year-old; being extremely thin with an extended stomach; and having numerous injuries over his entire body. His feet were swollen and purple, and his emotional state was abnormal in that he was extremely quiet and compliant for a 4½-year-old child who had been removed from his home.

Dr. Valerie Bailie, a pediatrician, examined R.W. at the emergency room on April 12. She also described R.W.'s general appearance as that of a 4-year-old who was the size of a 2-year-old, "very thin in appearance." He "was pitifully thin with very skinny arms and legs and . . . a very swollen protruding abdomen, typical protein malnutrition." He weighed about 22 pounds upon admission. Elizabeth Ann Kenyon, director of the Women, Infants, and Children (WIC) feeding program, testified that when R.W. first qualified for WIC on November 4, 1987, he weighed 25½ pounds. In January 1988, his weight was 25 pounds. In June 1988, R.W. weighed 23 pounds 10 ounces.

When Dr. Bailie first saw R.W., she said he was eating voraciously, was "very fixated on the food," and had little facial expression. Her examination showed that R.W. had a small cephalhematoma, or blood collection, under the skin on his right forehead; multiple small circular black bruises on his back; bruises on his lower lumbar region and upper buttocks; fresh abrasions and contusions on his buttocks; cigarette burns on his right elbow, on his right thigh and knee, and between the fourth and fifth left toes; old burns on both hands; purplish discoloration, swelling, and open sores on both feet; and an enlarged liver and spleen.

The parents had asserted that some of the injuries were caused by black fly bites and that others resulted from his bed-wetting. Dr. Bailie testified that the injury between the fourth and fifth toes could not have been caused by an insect bite. Dr. Ronald Blevins, a pathologist, testified that he

believed R.W.'s scars were not consistent with fly bites, but with cigarette burns. Dr. Bailie testified that prolonged exposure to urine or ammonia could cause the contusion appearance between the buttocks, but could not explain the other bruises on R.W.'s body. The condition of R.W.'s feet was typical of a frostbite injury, Dr. Bailie said, which could result from prolonged exposure to low, but not freezing, temperatures. Her examination results upon R.W.'s admission to the hospital were suggestive of child abuse, she said.

Dr. Bailie also examined R.W. the next morning and found that he had become very outgoing. He had not stopped eating since he came to the emergency room, Dr. Bailie said, and food was withheld because otherwise he would eat constantly.

Paetow interviewed the father at about 9:10 p.m. on April 12, 1989, at the Scottsbluff Police Department. T.W. told the police that the child no longer had a bed but slept on the floor because his bed had been ruined from bed-wetting. The room where R.W. sleeps is an unheated addition on the back of a trailer, so R.W. gets cold and that causes the frostbite, the father said. Paetow said the father explained that R.W.'s burns were carpet burns, not cigarette burns, and that the other injuries were black fly bites that R.W. had received in June 1988 which had not healed.

T.W. stated that their problems with the child stem from the involvement of T.W.'s parents in R.W.'s life. After the child has contact with them, T.W. said, R.W. whines and becomes a behavioral problem and has to be disciplined. T.W. stated that they have to spoonfeed R.W. because he refuses to hold his eating utensils in the way in which the parents prefer.

The father explained that R.W. does not chew his food adequately and swallows his food in chunks and that they believed that might be the reason for his weight loss. T.W. said they had been feeding the child chunky baby food in order to help him gain weight.

T.W. admitted that he may have struck R.W. in the mouth at some time, causing an injury to the tissue which attaches the upper lip to the gum, and that he had slapped R.W. in the face. The Child Protective Services worker also testified that T.W. had told her they had problems with R.W.'s behavior and with

R.W.'s wetting his pants.

Paetow interviewed the mother on April 12, 1989, at the police department. L.W. said the burns on the child's hands were received when the family lived in an apartment with floor-type radiators, which R.W. would hold when he was learning to walk. His foot injuries resulted from being cold and wet from his bed-wetting. The injuries which appeared to be cigarette burns were explained as either carpet burns or black fly bites from a visit to Maine. L.W. indicated that because R.W. does not chew his food properly, he receives two jars of baby food each day and also eats additional food with the family. The mother also stated that their problems with R.W. stem from the interference of the grandparents, who pay too much attention to R.W.

Kathleen Brozovich, R.W.'s foster mother, testified that R.W. was very quiet when she and her husband first picked him up from the hospital and that he was weak and had to be carried up and down the stairs in their home. R.W. was initially obsessed with food, but by the time of the hearing, Brozovich said he had changed and would eat normally.

After his visit with his parents at the evaluation with Slosnerick, R.W. told Brozovich that he wanted to live with her, and not with his "mommy and daddy." She also testified to an accidental meeting with T.W., in which neither R.W. nor T.W. acknowledged the other.

The record does not clearly explain why only one child in the family was treated in this manner. The mother testified that she was trying to help R.W. to have confidence "because he's my firstest son. Korean people for me . . . firstest son is a very important thing. . . . I kinda wait for a son, my firstest son, a copy of my husband, you know. Korean people, it very, very important." Both parents indicated that they believed the grandparents were interfering in their raising of R.W., and the mother seemed to feel slighted by the attention paid to the child. However, nothing adequately explains why parents would neglect and abuse one of their four children, yet the record is clear that this is the case. None of the witnesses testified that the parents at any time admitted any wrongdoing or indicated that their parental behavior would change if R.W. were returned to

the home. The evidence is clear and convincing that it is in R.W.'s best interests to terminate the parental rights of T.W. and L.W. because they are unwilling to alter their conduct which has led to the neglect and abuse of an innocent child. R.W. "cannot, and should not, be suspended in foster care, nor be made to await uncertain parental maturity." *In re Interest of C.N.S. and A.I.S.*, 234 Neb. 406, 410, 451 N.W.2d 275, 278 (1990); *In re Interest of R.T. and R.T.*, 233 Neb. 483, 446 N.W.2d 12 (1989).

The judgment is affirmed.

AFFIRMED.