IN RE INTEREST OF J.R.W., A CHILD UNDER 18 YEARS OF AGE.
STATE OF NEBRASKA, APPELLEE, V. A.W., APPELLANT.
467 N.W.2d 413

Filed March 29, 1991.   No. 90-118.

Richard Douglas McClain for appellant.

Alicia B. Henderson, Deputy Lancaster County Attorney, for appellee.

David A. Battiato, of Burns & Associates, guardian ad litem.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

WHITE, J.

The rights of A.W., the natural mother, to her minor

daughter, J.R.W., were terminated by an order of the Lancaster County Separate Juvenile Court, entered on January 16, 1990. The mother appeals the termination, assigning as error that the lower court did not require coordination of services by several governmental agencies, resulting in the placement of the mother, also a minor, "in various unsuitable and unlawful environments." The termination of the rights of the putative father, R.C., is not a part of this appeal.

In reviewing a termination of parental rights, the Supreme Court tries factual questions de novo on the record. This requires it to reach a conclusion independent of the trial court's findings. *In re Interest of K.M.S.*, 236 Neb. 665, 463 N.W.2d 586 (1990); *In re Interest of D.S. and T.S.*, 236 Neb. 413, 461 N.W.2d 415 (1990).

No complaint has been made here that the evidence is insufficient to support the termination. We note that termination " ' "is permissible when the basis for such termination is proved by clear and convincing evidence." ' " *In re Interest of K.M.S., supra* at 666, 463 N.W.2d at 588.

The child in question, J.R.W., was born on May 12, 1987, to A.W., who was born on December 3, 1972. The mother herself had been adjudicated a neglected child on three earlier occasions (January 1978, February 1982, and October 1983), and in October 1983, the juvenile court found that A.W.'s father, B.W., had had inappropriate sexual contact with her. The court ordered B.W. to have no contact with A.W., an order which remained in effect through all times relevant to this case. Between January 1978 and December 1985, A.W. was in and out of foster care, and was under either the custody or supervision of the Lancaster County division of public welfare or the Nebraska Department of Social Services (DSS).

Following two suspensions from school, A.W. was expelled on November 26, 1985, for kicking and threatening other students, using abusive language, and failing to turn in assignments. She was then placed at the Nebraska Center for Children and Youth (NCCY), where she continued her uncontrollable behavior, frequently running away and demonstrating verbal and physical aggression toward staff and other group members.

After an absence from NCCY between September 18 and October 3, 1986, A.W. returned, reporting that she was pregnant. She was moved to the Youth Service System's teaching and learning center (TLC), a residential facility for teen mothers during their pregnancies and following the birth of their children. On December 5, 1986, A.W. assaulted a resident and staff member at TLC, and was incarcerated at the Jennie B. Harrel Attention Center, a juvenile detention facility. After admitting the allegations in the juvenile court petition, she was placed on probation and returned to NCCY, which was the only setting available to a minor who exhibited assaultive behavior.

During A.W.'s high-risk pregnancy, she failed to follow medical advice and demonstrated no interest in learning parenting skills. She was moved to the behavioral medicine unit at Lincoln General Hospital during the last stages of her pregnancy.

Her daughter, J.R.W., was born on May 12, 1987. A petition was filed by the Lancaster County Attorney on May 14, alleging that J.R.W. was a child lacking proper parental care and support through no fault of her mother. The infant was placed in foster care, and A.W. returned to NCCY, where a plan was developed to allow daily visits with her child. In June, A.W. began running away from NCCY on a frequent basis, and she missed the scheduled visits with J.R.W. A plan to allow the baby to live on the NCCY campus with A.W. was terminated when A.W. continued to run away, and frequently returned in an intoxicated state.

The DSS caseworker developed a plan, including the provision of transportation, for daily visitation between A.W. and J.R.W. and for A.W.'s enrollment in Family Service's Parents and Children Together (PACT), a parenting skills program.

However, A.W.'s uncontrollable behavior continued. Between April 26, 1986, and August 25, 1987, 48 incident reports were filed at NCCY, including reports of physical threats, property destruction, running away, physical assaults, substance abuse, and possession of weapons. A supplemental petition and motion to revoke probation was filed in July 1987,

but before disposition could be entered, A.W. assaulted a police officer with a dangerous instrument and was placed at the attention center on August 25, 1987.

At the attention center, A.W. assaulted two staff members and damaged property. On September 22, 1987, the juvenile court found that A.W. was uncontrolled by DSS and that DSS had no program to meet A.W.'s needs. Following an evaluation at the Youth Development Center-Geneva, A.W. was committed on October 22, 1987, to the Nebraska Department of Correctional Services for placement at Geneva.

Continued efforts were made to reunite A.W. with her child. The foster parents took J.R.W. to the attention center weekly and to Geneva biweekly for visitations. The foster mother testified that the visits were not productive because A.W. spent only about 25 percent of the time interacting with the child.

At Geneva, A.W.'s behavior did not improve. She committed numerous violations, including using profanity, making verbal threats and outbursts, assaulting staff members and residents, fighting, and refusing to follow directions. Although she might have been eligible for parole in 4½ months, A.W. remained at Geneva for 10 months, until August 22, 1988, when she was paroled by the Department of Correctional Services to her father's home, despite the juvenile court's order that he have no contact with her.

Before A.W.'s release from Geneva, she signed a reunification plan, which had been developed with input from the DSS caseworker. The plan provided that if A.W. successfully participated in it for 6 months after her release, she would be allowed to reside with J.R.W. in a supervised setting. As part of the plan, A.W. agreed to (1) successfully complete the PACT program, (2) successfully participate in the YWCA's teen mothers program, (3) maintain a regular visitation schedule with J.R.W., (4) cooperate with J.R.W.'s caseworker, (5) successfully participate in an education plan, (6) avoid involvement in any law violations, (7) attend Alcoholics Anonymous, (8) participate in counseling, and (9) cooperate with her parole officer.

On December 6, 1988, at the first juvenile court review hearing following her parole, A.W. failed to appear, and the

court gave her 30 days to present a written plan for reunification. On January 19, 1989, she presented a photocopy of the earlier plan.

The Lancaster County Attorney filed an amended supplemental petition on December 7, 1988, alleging that J.R.W. lacked proper parental care through the fault and habits of her mother, A.W., and father, R.C. or John Doe, real name unknown. The petition asked for an order terminating parental rights, alleging that termination would be in J.R.W.'s best interests because her parents had substantially and continuously or repeatedly neglected J.R.W. and abandoned her for 6 months or more. The adjudication hearing on this petition was held on February 21, 1989, and neither A.W. nor R.C. appeared in court. Additional hearings were then held on March 31, April 3, and April 10, 1989.

In an April 17, 1989, order, the court found that the allegations were true and that A.W. had not visited or cared for her child on a regular basis since the child's birth. However, the court stated that it could not find that there had been a coordination of services for A.W., as required by the family policy act, Neb. Rev. Stat. §§ 43-532 to 43-535 (Reissue 1988). The court gave A.W. additional time and continued the hearing to October 12, 1989. The parental rights of the father, R.C., were terminated. The court approved a modified rehabilitation plan on May 30, 1989.

Between her parole in August 1988 and the termination hearings, A.W. took little action to work toward meeting the requirements of the rehabilitation plan. She twice failed to appear for intake meetings for the PACT program, and she was eventually terminated for lack of participation, completing only 6 of 54 sessions scheduled during the 18-week program.

A.W.'s caseworker agreed that if A.W. remained in school and attended a family living class, she would not have to participate in the YWCA teen mothers program, but she attended neither school nor the YWCA program. She later withdrew from school, and she attended fewer than one-half of her GED classes and never took the GED test. She eventually attended three of the YWCA's parenting classes.

J.R.W.'s foster mother testified that between A.W.'s release from Geneva, in August 1988, and December 1989, A.W.

visited J.R.W. for only 23 of 135 scheduled visitations. Despite a twice-weekly visitation schedule with transportation available, A.W. did not visit J.R.W. until September 15, 1988, and then did not visit again until January 17, 1989. She next visited on April 24, 1989. Her visits were intermittent until July 31, 1989, and then A.W. did not visit her daughter again until October 19, 1989. A.W. visited only twice in November and once in December 1989.

A.W. also failed to cooperate with her caseworker. She missed four meetings with no explanation and did not respond to letters until February 13, 1989, when she went to the DSS office to obtain glasses.

A.W. was also ordered to participate in individual counseling, but never began a therapy program, nor did she provide the requested proof of her attendance at Alcoholics Anonymous meetings.

Although the terms of her parole required her to live with her father, in violation of a juvenile court order, she instead lived with a boyfriend. A.W. did not inform her caseworker. When the caseworker requested the court to determine A.W.'s custody, the court held that A.W.'s custody reverted to DSS. The caseworker attempted to make arrangements for a more appropriate placement for A.W., but could not locate A.W., and later attempted contacts with A.W. were all unsuccessful.

A.W. gave birth to a second child in September 1989. The caseworker and an aide attempted to arrange an independent living situation for A.W., because there was no other appropriate placement for a teenager and her child. A.W. did not cooperate in looking for an apartment until she was told that she would be placed at the TLC home unless she found an apartment.

The case aide also attempted to help A.W. obtain aid to dependent children (ADC) so that she could live independently. After the aide provided an application to A.W. and submitted it for her, A.W. appeared for an interview at the ADC office with her boyfriend, T.M. The ADC worker subsequently requested additional information about T.M.'s income, and when A.W. did not respond to the request, the application was rejected.

A second referral to ADC was made. A.W. admitted that she lied at the second ADC appointment when she stated that she

was not living with T.M. Again, the ADC worker told A.W. she would need additional income and work information from T.M. At the time of the termination hearing in January 1990, T.M. had not complied with that request and the application was still pending.

An initial request for emergency housing assistance was denied because A.W. failed to follow through with the application process.

Testimony was also elicited from Dr. Ross Thompson, a developmental psychologist at the University of Nebraska, who testified that the bonding process between an infant and the caregiver has been completed at the age of 12 months, and any move to a new set of caregivers would be distressing and disruptive to the child. A.W.'s caseworker testified that she believed termination was in J.R.W.'s best interests because J.R.W. had been in the same foster home since she was a few months old, and because A.W. had not committed herself to the child.

Even though no error was assigned as to the sufficiency of the evidence, we find that the evidence is more than sufficient to terminate the parental rights of A.W. What little conflict there may be in the evidence is disposed of by our rule that we consider and may give weight to the trial court's observation of the witnesses and acceptance of one version of the facts rather than another. *In re Interest of D.S. and T.S.*, 236 Neb. 413, 461 N.W.2d 415 (1990); *In re Interest of A.B. et al.*, 236 Neb. 220, 460 N.W.2d 114 (1990).

The mother's assignment of error seems to assert that her rights were wrongly terminated because the governmental agencies involved did not coordinate their services to her. The Nebraska family policy act was passed to "guide the actions of state government in dealing with problems and crises involving children and families." § 43-532(1). The act calls for state entities to provide assistance "in the least intrusive and least restrictive method," and it states that the policy shall be implemented through cooperative efforts. § 43-532(2). It is true that the Department of Correctional Services paroled A.W. to her father's home, which violated an order by the juvenile court requiring her father, B.W., to have no contact with A.W.

However, we do not find that this mistake had any significant impact on this case. The evidence indicates that A.W. lived with a boyfriend instead of living with her father and that as soon as the DSS caseworker discovered this fact, she took steps to find a more appropriate placement for A.W. It is clear that A.W. did not cooperate with the DSS staff, and she cannot now complain that any lack of coordination of agency effort resulted in the termination of her parental rights.

A.W. also complains about the timelag in providing her with benefits from ADC and emergency housing assistance so that she could live independently and attempt reunification with her daughter at an earlier stage. No evidence has been presented to show that better coordination among the agencies would have improved A.W.'s parental skills. On more than one occasion, A.W. failed to take advantage of the available services or to follow through and provide necessary information to DSS.

A.W. was given numerous opportunities to demonstrate her interest in becoming a good parent and in being reunited with her child. Nebraska statutes provide the juvenile court with the discretionary power to prescribe a reasonable parental rehabilitation plan. *In re Interest of L.K.Y. and A.L.Y.*, 235 Neb. 545, 455 N.W.2d 828 (1990). Noncompliance with a reasonable plan of rehabilitation is sufficient grounds for termination of parental rights. *In re Interest of A.B. et al., supra.*

Our primary concern must be the child, who " 'cannot, and should not, be suspended in foster care, nor be made to await uncertain parental maturity.' " *In re Interest of R.W.*, 236 Neb. 420, 429, 461 N.W.2d 545, 551 (1990). Where parents are unable or unwilling to rehabilitate themselves within a reasonable time, the best interests of the child require that parental rights be terminated without delay. *In re Interest of A.B. et al., supra.* While A.W.'s background shows that her own life has not been easy, the fact remains that her daughter, J.R.W., is now nearly 4 years old and has had only sporadic and intermittent contact with A.W., who has not yet demonstrated her interest in being a mother to J.R.W. The order of the juvenile court terminating A.W.'s parental rights to J.R.W. is affirmed.

AFFIRMED.