review as to a necessary party. The district court lacked subject matter jurisdiction of the APA proceeding. When a lower court lacks the authority to exercise its subject matter jurisdiction to adjudicate the merits of the claim, issue, or question, an appellate court also lacks the power to determine the merits of the claim, issue, or question presented to the lower court. *McClellan v. Board of Equal. of Douglas Cty.*, 275 Neb. 581, 748 N.W.2d 66 (2008). However, when an appeal is dismissed because the lower court lacked jurisdiction to enter the order appealed from, an appellate court may nevertheless enter an order vacating the order issued by the lower court without jurisdiction. *Id.* Therefore, the judgment of the district court is vacated and this appeal is dismissed.

VACATED AND DISMISSED.

———————————

In re Interest of Skylar E., a child
under 18 years of age.
State of Nebraska, appellee, v.
Skylar E., appellant.
___ N.W.2d ___

Filed April 30, 2013.    No. A-12-490.

1. **Juvenile Courts: Minors.** The foremost purpose and objective of the Nebraska Juvenile Code is to promote and protect the juvenile's best interests.
2. **Juvenile Courts.** A juvenile court has broad discretion as to the disposition of a child found to be within the jurisdiction of the juvenile court under Neb. Rev. Stat. § 43-247(1) (Reissue 2008).
3. **Public Health and Welfare: Parent and Child.** Neb. Rev. Stat. § 43-532 (Reissue 2008) dictates that state policy is to assist juveniles in the least restrictive method consistent with the needs of each child.
4. **Juvenile Courts: Minors: Proof.** If a treatment level group home is the least restrictive placement consistent with a child's needs, a juvenile court may place the child into a more restrictive level of care only after the State makes a showing that a treatment level group home is not a viable option for the child.

Appeal from the County Court for Adams County: Michael Offner, Judge. Reversed and remanded with directions.

T. Charles James, of Langvardt, Valle & James, guardian ad litem for appellant.

Amy R. Skalka, of Seiler & Parker, P.C., L.L.O., for appellant.

No appearance for appellee.

Moore, Pirtle, and Riedmann, Judges.

Riedmann, Judge.

## INTRODUCTION

This appeal raises the issue of whether the juvenile court erred in committing Skylar E. to the Youth Rehabilitation and Treatment Center (YRTC) for the pendency of his minority despite recommendations by two psychologists, working on behalf of the State, that a lower level of treatment be provided. Neb. Rev. Stat. § 43-532 et seq. (Reissue 2008 & Cum. Supp. 2012) requires a juvenile court to place a minor in the least restrictive setting consistent with Nebraska law and with the minor's best interests. We therefore find that the juvenile court abused its discretion in committing Skylar to YRTC without requiring the Nebraska Department of Health and Human Services (DHHS) to explore the option of a less restrictive placement, such as a treatment level group home, as recommended by the State's psychologists.

## BACKGROUND

Skylar is a 15-year-old male. In November 2010, when Skylar was 13, the State removed both him and his sister Alyson D. from his mother's care. The juvenile court initially acquired jurisdiction of both Skylar and Alyson under Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2008) because their mother was living in a halfway house and was unable to care for them. While proceedings were ongoing under § 43-247(3)(a), Skylar was transferred to a number of different placements as further set forth below. In January 2012, while placed at the Madison Detention Center, Skylar punched a wall. He was found guilty of criminal mischief, which triggered an Office of Juvenile Services (OJS) evaluation and caused the juvenile court to acquire jurisdiction of him under § 43-247(1). The case was transferred from Madison County to Adams County.

*State Placement History.*

When Skylar was first removed from his mother in November 2010, he was placed in foster care. While at this foster care placement, Skylar began therapy with Dr. Doyle Daiss. Dr. Daiss scheduled a weekly appointment for Skylar, but the foster parents were able to take Skylar to only 13 of 21 scheduled sessions. Both Skylar and Dr. Daiss worked together to craft a treatment plan focusing on the need to manage anger and impulses. They both considered their relationship positive and productive.

Skylar initially achieved success in his foster care placement. In January 2011, a social worker described Skylar as happier than she had ever seen him. In April 2011, however, Skylar was expelled from school for bringing a knife to school and allegedly threatening the principal. Dr. Daiss testified that Skylar possessed knives to protect himself because no adult had ever been able to meet that need for him. Skylar's behavior deteriorated after the expulsion, and in July 2011, the State removed Skylar from the foster placement because his foster parents reported "defiant behaviors" and Skylar's fleeing on various occasions.

The State then placed Skylar at a Boys Town shelter for a few months before placing him and Alyson in a second foster home. Skylar did well there for a while, but he also had episodes of concerning behavior. On one occasion, Skylar took a knife from his foster father, and on another occasion, the family smelled smoke in the middle of the night and discovered that "something had been snubbed out in the cat's dish." Skylar would also, on occasion, leave for hours at a time without permission and refuse his medication. The culmination of these incidents prompted the State to remove Skylar from the second foster home.

After his removal from the second foster home, Skylar went to Cedar Youth Services, a shelter in Lincoln, before a group home in Geneva accepted him. The State removed Skylar from the group home in Geneva after he ran away twice—once to see his girlfriend in Harvard and once to see Alyson in Aurora. Skylar stole a car in conjunction with his attempt to travel to Aurora.

The State next placed Skylar at a foster home in Henderson, followed by a group home at Epworth Village in Grand Island. The Epworth Village group home is separate from the Epworth Village treatment level group home. Skylar ran away from the Epworth Village group home three times in 5 days, causing the State to place him in a shelter at Madison. After he failed to follow the rules at the Madison shelter, he was moved to the Madison Detention Center. The State tried to place him at the foster home in Henderson again, but the State returned him to the Madison Detention Center after he "left school" and was found in his bedroom closet with another youth.

Upon Skylar's return to Madison, in January 2012, he punched a wall at the detention center. This action resulted in criminal charges that led to the adjudication under § 43-247(1) which is at issue in this case.

Throughout this time, Dr. Daiss attempted to schedule therapy for Skylar, but the logistics of transportation combined with Skylar's frequent movement prevented them from regularly meeting. Dr. Daiss testified at trial that he would "[m]ost definitely" be willing to work with Skylar again "down the road."

Throughout this time, Skylar's visits with his mother and Alyson decreased. Skylar last saw his mother in December 2011, and since then, he has had contact with her only through letters.

*Testimony at Trial.*

In April 2012, the Adams County Court held a hearing to determine Skylar's next placement in light of the criminal mischief conviction. The State, DHHS, Skylar, Skylar's mother, and Skylar's guardian ad litem all appeared at the hearing.

Several professionals testified that Skylar's mother and Alyson are critically important to Skylar. Therapists and social workers observing visitation described Skylar as parental toward Alyson and protective of his mother. A report from Dr. John Meidlinger reveals that Skylar described to him some of his mother's past boyfriends as being physically violent toward her and that Skylar recalled a time where he threatened to beat up one of them. Dr. Meidlinger's report indicates that Skylar

told him that he does not care what happens to him, but will protect his family at all costs.

According to Dr. Meidlinger, Alyson is the only sibling with whom Skylar has contact. He mentioned in his report that Skylar communicated that he does not care where he goes as long as he can see Alyson.

Dr. Meidlinger observed that Skylar is steadfastly loyal to his mother and continues to believe she will "get her life straightened out" and raise him and Alyson. He indicated in his report that Skylar continues to hope for this outcome despite his mother's failure to attend many of the visitations arranged with Skylar and Alyson after losing custody of them. DHHS' visitation logs indicate that Skylar told his mother all he wanted for Christmas was to go home. Skylar estimates that since entering the State system, he has been placed in about 15 different foster care, group home, and shelter situations without success.

Dr. Meidlinger testified that he diagnosed Skylar with dysthymia, oppositional defiant disorder, and attention deficit hyperactivity disorder. He stated that he did not have enough information to make a diagnosis of conduct disorder but that Skylar resembles children with conduct disorder in some ways. Dr. Meidlinger opined that Skylar's "experiences have led him to believe that life isn't fair and authorities are the people in charge and what they do is not fair either." Dr. Meidlinger thought that Skylar's "bold and defiant attitude is perhaps a way of hiding his inner feelings of weakness, vulnerability and history of victimization."

Dr. Meidlinger recommended that Skylar begin a counseling process focusing on issues of abandonment and, perhaps, trauma. He opined that those issues may be causing his "aggressive posturing" and acting out. He further recommended that Skylar be placed in a treatment level group home and then a less restrictive setting if appropriate. He stated that the treatment home at Epworth Village would meet Skylar's needs. He was decidedly less enthusiastic about placing Skylar at YRTC, where therapy would be more limited. Throughout his testimony, Dr. Meidlinger expressed his belief that Skylar's underlying issues have played an important role

in shaping his behavior and that addressing those issues, rather than just Skylar's behavior, would be the most effective way to treat Skylar.

Dr. Eric Snitchler testified that he conducted the psychological evaluation for Skylar's OJS evaluation in March 2012. He stated that he works with a therapy services company which has a contract with Magellan Health Services (Magellan). The contract with Magellan places Dr. Snitchler under restrictions with respect to what he can recommend in his written report. In his written report, Dr. Snitchler diagnosed Skylar with "conduct disorder, attention deficit, hyperactivity disorder, alcohol abuse, [and] nicotine dependence," although he stated that he would have liked to have had more information about Skylar's earlier background to give him some indications as to how those problems originated.

Dr. Snitchler explained that he made no recommendations for treatment in his report because Magellan does not allow him to recommend treatment unless he makes "a sub-acute treatment placement" recommendation. Dr. Snitchler said that he was not under Magellan requirements while testifying in court, however, and for the first time, at trial, he recommended placing Skylar into a treatment level group home. For this placement to be successful, a group home would need to accept Skylar and Skylar would need to cooperate and maintain the placement. Dr. Snitchler felt a treatment level group home would be the most appropriate placement for Skylar because Skylar could get outpatient therapy treatment in that setting.

Dr. Snitchler stated, however, that Magellan would not pay for treatment for Skylar because Skylar was diagnosed with conduct disorder and conduct disorder has not been something research has shown benefits from a treatment level placement. Dr. Snitchler also said he suspected many group homes would not take Skylar because of his past behavioral problems.

Ann Wood is the OJS evaluation coordinator for DHHS who performed Skylar's OJS evaluation. She explained that an OJS evaluation is ordered after a youth has been adjudicated. Her role is to put information together and send it to Magellan for assignment to a provider. She explained that she looks at the

recommendation provided by the Magellan provider together with an internal youth level of services inventory (YLS) and makes a recommendation for a youth's disposition based on those two documents. YLS is an assessment that measures a youth's level of risk to reoffend. It is "a matrix and scoring system that is somewhat standardized." Wood testified that Skylar's YLS score was 25, which is a high level of risk to reoffend on a scale with four levels ranging from low to very high.

Wood recommended Skylar be placed at YRTC because he has a high risk to reoffend and has been in multiple placements without success. She explained that in evaluating Skylar's risk to reoffend, she found Skylar's family circumstances to be his highest risk score, elevating his overall YLS rating. A section on attitude and orientation also mentions that Skylar is not participating in therapy and labels that as a risk factor.

Wood stated that DHHS recommends YRTC as the next level of care for juveniles if foster placements and group homes are not adequate. Wood explained that she is not allowed to recommend a treatment level group home unless it is "approved by the clinician who does the clinical portion of the evaluation" by Magellan. In this case, Wood could not have recommended a treatment level group home unless Dr. Snitchler recommended a treatment level group home in his written evaluation.

Dr. Daiss testified about his relationship with Skylar from February through October 2011. He testified that he thought the relationship was productive, but that he could not reach the issues causing Skylar's behavior because of Skylar's inconsistent presence. Dr. Daiss stated that Skylar needed to have contact with both his mother and Alyson to make progress.

*Trial Court Ruling.*

The trial court committed Skylar to YRTC for the pendency of his minority. In a ruling from the bench, the trial court explained one reason for sending Skylar to YRTC was its doubt that a treatment level group home would accept him. The trial court emphasized Dr. Snitchler's language, noting that he said

he would recommend a treatment level group home for Skylar *if* any of the group homes would take him into their program. The trial court stated:

> But he said if anybody would take him, okay he did. And I took the if, I'm saying here, if they would take him, that would be great. And if he would work through the system, that would be great. If he didn't, then it's not going to work. . . . But in the end we both . . . have the shrinks saying that this is the best, best practices. We know what best practices means. That's a fancy word where people come from New York and they give us a lecture and they are trying to tell us that this is what you ought to do if the world was pure and clean and we had every opportunity that we possibly have. And that's what we are striving for. But we also have to look at reality and that's what we're going to talk about at the end.

The trial court went on to state that the reality is that the trial court "[didn't] think someone might even take [him] because of [his] history, okay. That's going to be the reality."

The trial court also explained that Skylar's way of treating people caused the State to remove him from his placements, which disrupted his therapy and visitation. Finally, the trial court explained that Skylar needed stability for education and that YRTC would allow that. The court also stated that therapists at a treatment level group home would not have anything new to say in therapy and that therefore, there was no reason to believe Skylar would not run away again.

On appeal, the guardian ad litem and Skylar's attorney argue that the trial court erred in finding that placement of Skylar at YRTC was the least restrictive placement and in Skylar's best interests. DHHS did not file a brief in this appeal.

## ASSIGNMENTS OF ERROR

The guardian ad litem and Skylar's attorney both argue that the trial court abused its discretion in committing Skylar to the care and custody of OJS for placement at YRTC because it is not the least restrictive placement consistent with Skylar's best interests. Neither the State nor DHHS filed a brief in this action.

## STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. *In re Interest of Jorge O.*, 280 Neb. 411, 786 N.W.2d 343 (2010). To the extent an appeal presents questions of law, an appellate court must reach a conclusion independently of the trial court. *In re Interest of Jones*, 230 Neb. 462, 432 N.W.2d 46 (1988). A trial court's findings of fact will not be set aside unless they are against the weight of the evidence or there is a clear abuse of discretion. *Id.*

## ANALYSIS

[1] Section 43-247(1) grants the juvenile court jurisdiction of any minor under the age of 16 who has committed "an act other than a traffic offense which would constitute a misdemeanor or an infraction under the laws of this state, or violation of a city or village ordinance." See *In re Interest of Roy R.*, 3 Neb. App. 816, 533 N.W.2d 107 (1995). When a court takes jurisdiction over a juvenile, it obtains the "powers conferred on it by the Nebraska Juvenile Code . . . to provide for the treatment and rehabilitation of certain juveniles." *In re Interest of Breana M.*, 18 Neb. App. 910, 914, 795 N.W.2d 660, 664 (2011). The foremost purpose and objective of the Nebraska Juvenile Code is to promote and protect the juvenile's best interests. *In re Interest of Brandy M. et al.*, 250 Neb. 510, 550 N.W.2d 17 (1996).

[2,3] A juvenile court has broad discretion as to the disposition of a child found to be within the jurisdiction of the juvenile court under § 43-247(1). See Neb. Rev. Stat. § 43-286 (Cum. Supp. 2012). In such a case, the juvenile court may commit such juvenile to OJS for placement at YRTC if the youth is over the age of 14. See § 43-286(b). At the same time, § 43-532 dictates that state policy is to assist juveniles in the "least restrictive method consistent with the needs of [each] child." See *In re Interest of J.R.W.*, 237 Neb. 691, 467 N.W.2d 413 (1991). The policy applies to "children . . . who, by their circumstances or actions, have violated the laws, rules, or regulations of the state and are found to be in need of treatment or rehabilitation" and must be interpreted "in

conjunction with all relevant laws, rules, and regulations of the state." § 43-532.

In this case, the juvenile court acquired jurisdiction of Skylar pursuant to § 43-247(1) because Skylar was adjudicated for violating Neb. Rev. Stat. § 28-519(1)(a) (Reissue 2008), property damage, after punching the wall at the Madison Detention Center. Because it acquired jurisdiction of Skylar under § 43-247(1) and Skylar is older than 14, the juvenile court had the power to send Skylar to YRTC. In making that decision, the juvenile court was required to find that a less restrictive placement was not consistent with Skylar's needs.

We find that the trial court abused its discretion in finding that YRTC was the least restrictive placement consistent with Skylar's needs. The trial court considered placing Skylar in either YRTC or a treatment level group home. The trial court rejected a treatment level group home based on two primary concerns: that Skylar would not be accepted into a treatment level group home and that Skylar would not achieve the stability he needs in a treatment level group home because he would run away.

[4] The trial court's concern that Skylar may not be accepted into a treatment level group home is speculative at this point because DHHS has not yet explored this placement possibility. If a treatment level group home is the least restrictive placement consistent with Skylar's needs, the court may place Skylar into a more restrictive level of care only after the State makes a showing that a treatment level group home is not a viable option for Skylar. See, § 43-532 et seq.; *In re Interest of J.R.W., supra*.

The trial court validly raises concern about Skylar's need for stability and history of leaving placements. This concern requires analysis in the context of the testimony presented at trial. Three psychologists testified at trial: Dr. Daiss, who completed a number of sessions with Skylar before he arrived at the Madison Detention Center; Dr. Meidlinger, who evaluated Skylar at the Madison Detention Center; and Dr. Snitchler, who conducted interviews and reviewed Skylar's file as part of the OJS evaluation. All three psychologists admitted that Skylar

has some behavioral issues. Skylar has difficulty with impulse and anger control and has not yet been able to discuss his past or analyze the impact of documented childhood difficulties on his decisionmaking.

The State removed Skylar from the care of his mother when he was an adolescent. He is steadfastly loyal to her and has responded to the State's decision to remove him from her care with anger, defiance, and, on occasion, running away from the State's placements. Despite his poor decisions, Skylar was able to maintain a positive therapeutic relationship with Dr. Daiss and identified weaknesses in his anger and impulse control. Dr. Daiss felt the relationship was productive and testified that he thought Skylar could benefit from therapy. Both Drs. Daiss and Meidlinger testified that Skylar's behaviors are a response to underlying issues that could be addressed with the appropriate therapy. Dr. Daiss could not make a treatment recommendation, but both State doctors testified that a treatment level group home, which is a level of care Skylar has never received, would be the appropriate level of care to meet Skylar's needs. Skylar's DHHS caseworker made no recommendation about his placement.

The only individual who recommended that Skylar be sent to YRTC was Wood. At trial, however, Wood testified that Magellan rules prevented her from recommending a treatment level group home because Dr. Snitchler had not recommended one in his evaluation. Dr. Snitchler did, however, make that recommendation in court. Wood's opinion must be somewhat discounted because she was prevented from recommending a treatment level group home.

Moreover, the record does not show that Wood ever met with Skylar. Instead, Wood relied on a report that did not express Dr. Snitchler's full opinion and the YLS score. The YLS score is an objective test that does not take into account the specifics of Skylar's situation; for example, his score is inflated because he is not participating in therapy, even though he wants to participate.

In this case, all of the experts who had the authority to recommend a treatment level group home did so. All three doctors thought Skylar would benefit from therapy, and the two who

were able to recommend placements opined that placement at a treatment level group home was the most effective way to address Skylar's poor judgment and behavior. The evidence in this case shows that a treatment level group home is in Skylar's best interests. Because a treatment level group home is a less restrictive level of care consistent with Nebraska law and Skylar's needs, the trial court abused its discretion in ordering Skylar's placement at YRTC. Accordingly, the order of the juvenile court committing Skylar to YRTC is reversed and the cause is remanded with directions for the court to order DHHS to explore whether less restrictive placement settings are available for Skylar's care, to include, but not be limited to, a treatment level group home.

## CONCLUSION

The trial court abused its discretion in committing Skylar to YRTC when the evidence in the record proves that committing Skylar to a less restrictive level of care was consistent with Skylar's best interests. Accordingly, we reverse the decision of the trial court and remand the cause with directions for the court to order DHHS to explore whether less restrictive placement settings are available for Skylar's care, to include, but not be limited to, a treatment level group home.

Reversed and remanded with directions.