IN RE INTEREST OF S.R., D.R., AND B.R., CHILDREN UNDER 18 YEARS OF AGE.
STATE OF NEBRASKA, APPELLEE, V. J.R., APPELLANT.
479 N.W.2d 126

Filed January 24, 1992.   No. 91-136.

David A. Battiato, of Burns & Associates, for appellant.

Linda S. Porter, Deputy Lancaster County Attorney, for appellee.

Mary Stoughton Wenzl, guardian ad litem.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

CAPORALE, J.

The separate juvenile court terminated the parental rights of the father, J.R., and of the mother, D.R., in and to their three children: S.R., a boy born July 25, 1983; D.R., a girl born October 15, 1984; and B.R., a boy born December 1, 1985. Only the father has appealed, claiming, in summary, that the juvenile court erred by finding that the evidence clearly and convincingly establishes (1) the need for terminating his rights and (2) that such serves the best interests of the children. We affirm.

Apparently because of some event not described in this bill of exceptions of 1,970⅓ pages, the State first became interested in these children in September 1986. The record does show that the State was concerned about the condition of the home the children occupied and about the physical and medical care they were receiving. In any event, the parents at that time agreed to work with the State on their parenting, budgeting, and housekeeping skills, and the State agreed to provide them with a

family support worker and with the equipment needed to clean the family's house and clothes.

On December 16, 1986, a Lincoln police officer visited the home and found a pile of human feces on the floor and a strong odor of human waste. The children were playing on a carpet which was soaked with human waste and old food items. The food cupboards were roach infested, dirty clothes were scattered everywhere, and the children's room contained a large pile of dried feces and used toilet paper. The bedding in the baby crib was filthy. The children were thereupon placed in temporary emergency foster care.

On December 18, 1986, the State filed a petition asking the juvenile court to assert jurisdiction, alleging that the children lacked proper parental care by reason of the faults and habits of their parents and thus were subject to the juvenile court's jurisdiction under the provisions of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 1988). More specifically, the petition alleged that the children were improperly clothed, had head lice, were covered with dried feces and food, and emitted a smell of urine. In addition, the petition asserted that the family home was kept in a filthy condition, with feces, garbage, old food, dirty clothes, and other debris scattered throughout, and that it was infested with roaches and other bugs.

The parents admitted these allegations at the adjudication hearing held on December 23, 1986. The juvenile court thereupon took jurisdiction over the children and placed their temporary legal custody with the state Department of Social Services, granting the parents reasonable rights of visitation. At this time, the parents were ordered to correct the conditions of the home.

At the disposition hearing in January 1987, the juvenile court returned the children to the parents and ordered the implementation of a rehabilitation plan which, among other things, required the parents to provide the children with a clean, safe, and stable home and to attend counseling as well as parent training classes. Over the ensuing years, the parents received extensive assistance from the State, including the services of family support workers, placement in parenting classes, and the provision of transportation, food vouchers, appliances, and

cleaning services. For the first several months, a family support worker spent 5 to 7½ hours a day 5 days a week with the parents, working on parenting, home management, and hygiene skills. Despite this assistance, the children had to be removed from their parents' home two more times, first in March 1987, just 3 months after the initial disposition, when the guardian ad litem filed a motion requesting an early review of the case, as two of the children had been hospitalized with shigellosis, "a communicable disease which can be is [sic] contracted by eating food that has been prepared under unsanitary conditions, or by being exposed to infected fecal material . . . ." By December 7, 1987, all three children had again been returned to the parents on a trial basis.

For the next year, the State continued to work with the parents on matters related to cleanliness, medical care, and nutrition. A family support worker spent several hours a day three times per week with the parents. Nonetheless, at the review hearings held in March and September 1988, the State continued to express concerns about the inadequate care the parents gave the children and the unclean conditions of the home. The juvenile court ordered further training.

In December 1988, the guardian ad litem again filed a motion requesting an early review hearing, claiming that the parents' care and supervision of the children was deficient and that the conditions of the home had deteriorated once again. A hearing was held on the motion in January 1989. The testimony revealed that despite the extensive help which had been provided them during the preceding 2½ years, the parents failed to show any consistent or significant improvement in the care of their children or the conditions of their home. The children were once again placed in foster care, where they have remained ever since; the rehabilitation plan designed to reunite the family was continued in full force and effect with a few minor modifications.

From January until May 1989, the parents continued to have supervised visitation with their children. The supervision was provided by a family support worker, who continued to monitor the conditions in the home and provide the parents help with budgeting, meal planning, supervision of the

children, and parenting skills. In May 1989, the father was jailed for failure to pay child support for a child not involved in this action. When he was released from jail 3 weeks later, he returned to the family home to find that the mother had moved out and was living elsewhere with a boyfriend. As of this time, the mother virtually stopped having contact with her children. The father, however, resumed his visitations almost immediately after his release from jail and continued to visit the children at least three times a week for 2 hours at a time.

In August 1989, the father was evicted from the home for nonpayment of rent; he thereafter failed to establish another residence of his own. He spent a few months living with various friends until he began cohabiting with his girl friend and her daughter in October 1989. From October 1989 until May 1990, his visitations with the children were conducted either at his girl friend's or at various public parks. These visitations were, at the father's request, generally supervised by a family support worker. The support worker testified that the father was generally very passive during these visits and had to be consistently prompted to interact with and supervise the children.

At long last, in July 1990, 3½ years after the State first intervened in the children's lives, it filed a motion to terminate the parents' rights under the provisions of Neb. Rev. Stat. § 43-292 (Reissue 1988), alleging that the father substantially and continuously or repeatedly neglected the children and failed to give them necessary parental care and protection, and that he, despite reasonable efforts under the direction of the juvenile court, failed to correct the conditions leading to the December 1986 determination that the children were within the purview of § 43-247(3)(a).

The hearing on the termination petition took place over a period of 7 days during the months of September, October, and November 1990. In addition to the facts above stated, the evidence demonstrated that despite the father's 9 months of steady employment, at which he earned approximately $700 per month, he had not managed to put any money toward establishing a home for the children, this despite the fact that his monthly expenses should have been less than $400. In

addition, there was testimony that there was unlikely to be any improvement in the father's parenting skills, that it was unlikely he would be able to assume proper care of the children, and that there had been no bonding between the father and the children such that the children would be injured by termination of the father's relationship.

On November 26, 1990, the juvenile court entered the order here appealed.

It is well settled that this court reviews termination of parental rights cases de novo on the record and is required to reach a conclusion independent of the juvenile court's findings, but when the evidence is in conflict, this court considers and may give weight to the fact that the juvenile court observed the witnesses and accepted one version of the facts over another. *In re Interest of A.C., ante* p. 734, 478 N.W.2d 1 (1991). See, also, *In re Interest of C.W. et al., ante* p. 817, 479 N.W.2d 105 (1992). In the absence of any reasonable alternative and as the last resort to dispose of an action brought pursuant to the Nebraska Juvenile Code, termination of parental rights is permissible when the basis for such is proved by clear and convincing evidence. *In re Interest of M.P.,* 238 Neb. 857, 472 N.W.2d 432 (1991). In order to terminate parental rights, it must be established that such is in the child's best interests and that there exists at least one of the grounds enumerated in § 43-292. *In re Interest of A.C., supra.* We, independently from the findings of the juvenile court, conclude that the evidence summarized above clearly and convincingly establishes that the statutory grounds asserted by the State for terminating the father's parental rights indeed exist and that the evidence further clearly and convincingly establishes that termination of such rights is in the children's best interests.

The father's suggestion that the evidence is lacking because there is no showing the State has "exhausted all alternatives" can only be described as logically preposterous and legally frivolous. First of all, the requirement is not that all possible alternatives be exhausted, but that *reasonable* efforts be made to reunite the juvenile and his or her family. Neb. Rev. Stat. § 43-246 (Reissue 1988); *In re Interest of M.P., supra.*

The State made extraordinary efforts to reunite the family;

various caseworkers and family support workers literally spent days with the parents over protracted periods of time in an effort to teach them very basic parenting and living skills. The parents were allotted an inordinate amount of time within which to comply with a reasonable plan of rehabilitation calculated to protect the children's safety and welfare by providing them a stable, nurturing, and healthful home. The record clearly and convincingly establishes not only that this was not accomplished, but that there is no reasonable likelihood that the father will ever comply with the plan and become a fit parent. As we have observed in the past, although a reasonable plan of rehabilitation is not a prerequisite or condition precedent to the termination of parental rights, *In re Interest of A.C., supra*, noncompliance with such a plan is, in and of itself, a sufficient ground for termination of parental rights, if such is shown to be in the child's best interests. See *In re Interest of J.R.W.*, 237 Neb. 691, 467 N.W.2d 413 (1991).

The most absurd aspect of this case is that it has taken the system more than half a decade to finally make the determination which should have been obvious as inevitable much earlier in the process. It should certainly have been apparent to any reasonable person long before the guardian ad litem's second intervention in December 1988 that the parents were not likely to ever provide the children with a stable, clean, and safe home in which to grow and mature. Yet, it took the State another year and a half to seek termination of the parents' rights.

As a consequence, the children have been forced to languish for more than 27 percent of their childhood (if childhood can be said to last as long as one's minority) in the clutches of a torpid bureaucracy which was created and is maintained to rescue them and others similarly situated from unfit parents.

To be sure, the fundamental liberty interest of natural parents in the care, custody, and control of their children does not end simply because they have not been model parents or have lost temporary custody of their children to the State. *Santosky v. Kramer*, 455 U.S. 745, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). But when parental control fails, the State must play its part as parens patriae. *Schall v. Martin*, 467 U.S. 253, 104 S.

Ct. 2403, 81 L. Ed. 2d 207 (1984). See *In re Interest of R. G.*, 238 Neb. 405, 470 N.W.2d 780 (1991).

We recognize, too, that constitutional adjudication pays heed to higher values than speed, efficiency, and efficacy. *Stanley v. Illinois*, 405 U.S. 645, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972). But such adjudication does not require belaboring the painfully obvious. When reasonable efforts demonstrate that it is unlikely that a family can be reunited, the perishable nature of childhood requires that that which must be done gets done. As we have observed in the past, children cannot, and should not, be suspended in foster care nor be made to await uncertain parental maturity prior to termination of parental rights. *In re Interest of L. J., M. J., and K. J.*, 238 Neb. 712, 472 N.W.2d 205 (1991).

The record sustaining neither of the father's summarized assignments of error, the judgment of the separate juvenile court is affirmed.

AFFIRMED.