IN RE INTEREST OF HEATHER G. ET AL.,
CHILDREN UNDER 18 YEARS OF AGE.
STATE OF NEBRASKA, APPELLEE AND CROSS-APPELLEE, V.
TERESA S., APPELLANT AND CROSS-APPELLEE, AND
KEVIN G., APPELLEE AND CROSS-APPELLANT.
664 N.W.2d 488

Filed July 8, 2003.   No. A-01-1383.

14

James H. Truell, of Truell, Murray & Maser, P.C., for appellant.

Robert J. Cashoili, Deputy Hall County Attorney, for appellee State of Nebraska.

Todd V. Elsbernd, of Bradley, Elsbernd & Emerton, P.C., for appellee Kevin G.

HANNON and MOORE, Judges.

HANNON, Judge.

## INTRODUCTION

The juvenile court terminated the parental rights of Teresa S. and Kevin G., divorced and separated parents, as to their children pursuant to Neb. Rev. Stat. § 43-292(2), (4), and (6) (Reissue 1998). Teresa and Kevin separately appeal, but both resist termination of their respective rights, and when common reference to both herein is meaningful, we therefore designate them as "the appellants." The children have been in foster care since July 2000,

and both of the appellants admit that they could not care for the children appropriately at the time of the hearing but resist termination of their parental rights in order to retain their visitation rights. We conclude that the condition described in § 43-292(6) exists, but that the State did not prove by clear and convincing evidence that termination of the appellants' rights is in the children's best interests. Accordingly, we reverse, and remand with directions to dismiss the State's motion.

## BACKGROUND

The appellants are the biological parents of Heather G., Spencer G., and Alex G., who were ages 10, 12, and 13, respectively, at the time of the termination hearing on November 26, 2001. Two of the children have special needs: Alex has cerebral palsy, and Spencer has "ADHD," which Kevin called "ADD hypertension deficit," for which Spencer takes the medication "adderal." The family has a long history of contacts with the Department of Health and Human Services (the Department) and the juvenile court. The appellants were divorced on December 21, 1993, and Teresa initially had custody of the children pursuant to the divorce decree. There had been some contact between the family and the Department before the divorce, but that is not meaningful at this time. The children were taken from Teresa and placed in foster care through juvenile court proceedings in late 1993. Two years later, Kevin obtained custody and retained it except when the children were placed as outlined below. The last proceeding for adjudication was commenced on July 18, 2000. We glean the following history from the record:

Teresa had lived with Junior M. for approximately 8 years preceding the termination hearing. They split household expenses equally. Their relationship is and has been a turbulent one, with arguments in front of the children and, on at least one occasion, an assault of Teresa by Junior. Spencer is afraid of Junior. Junior refused to be part of a case plan. Teresa has been allowed to visit the children regularly since they were removed from her care in 1995, and she has always done so when allowed. Recently, because of Junior, visitations have been at the home of Teresa's mother. Teresa works at Triad Fasteners and takes home approximately $1,000 per month. She received a $10,000 settlement for

a personal injury claim, but after paying bills, she still had to file for bankruptcy. She has been ordered to pay $75 per month in child support and has done so, except that she was approximately $300 behind at the time of the termination hearing.

A clinical psychologist examined and tested Teresa in November 2000. The record contains his thorough opinion. It contains much that would support a conclusion that Teresa is unlikely to be able to have custody of the children in the foreseeable future. On the other hand, it contains nothing which would indicate that her visits with the children would be harmful to them. Otherwise, the opinion is not helpful to a resolution of the case. The evidence of Teresa's relationship with the children will be summarized later.

It is clear that the children cannot live with Teresa and Junior. Apparently, Teresa recognizes that she is not and will not be in a position to have custody of the children. She admitted as much and resists termination of her parental rights because she wants to preserve her visitation rights. Specifically, she does not seek physical or legal custody of the children, but wishes to preserve her right to visit the children.

Apparently, when Kevin obtained custody of the children in late 1995, he was living with his girl friend, Carol L. Carol has two children of her own, ages 14 and 16 at the time of the termination hearing. Kevin's and Carol's families lived together from the time Kevin obtained custody until June 1997. At that time, Carol was accused of abusing Alex. Kevin obtained his own home, and the appellants' children lived with him for 2½ years. He was able to acquire and maintain the home with the help of the Department of Housing and Urban Development (HUD). The children lived with him until they were finally removed in these proceedings in July 2000. However, while he had custody, there were proceedings against him, and the children were placed in foster care. In September 1997, the children were removed for several months. In October 1998, they were removed on a complaint through their school that Kevin had abused them, and a voluntary placement in foster care was arranged. There was also a complaint that Kevin had touched Heather improperly, but the allegations of this complaint were not established and it was dismissed.

When the children were removed in these proceedings on July 18, 2000, Kevin lost the help of HUD and consequently lost possession of the home. If the children were placed back with him now, he would still have to wait 3 years for HUD assistance. He now lives with Carol, who has indicated that she has no interest in parenting Alex but is willing to parent Spencer. In substance, Kevin testified that Carol is not capable of parenting Alex because of his special needs.

At the time of the termination hearing, Kevin had been working at the Saddle Club as a cook for approximately 6 weeks, making $7 per hour, for approximately 30 hours per week. Before that, he had worked for Monfort, but had lost that job when he was arrested for the alleged sexual assault of Heather. (The charge was never substantiated and was dismissed.) For a while after he lost his job with Monfort, he was unemployed, and he did not give a satisfactory explanation for this unemployment. At the hearing, he admitted that he does not have enough money to support the children adequately. One of the grounds for adjudication was that he had a boa snake in the home. He testified that he likes snakes and maintained that the snake did not endanger the children. He also likes to go to meetings with friends who own motorcycles, and in violation of a case plan, he went to such meetings at a bar. There is evidence that he has had drug and alcohol problems in the past, but no evidence that he has recently used drugs or alcohol to excess.

Before the termination hearing, Kevin was visiting the children from 9 a.m., when he picked them up, until about 3 or 3:30 p.m. once a week. He testified that when he told the children in October that officials wanted to terminate his parental rights, "Alex was bawling. Spencer [was] kind of like, you know, tearing, and Heather . . . was off in left field." He did agree with Joan Prince, a child protective service worker for the Department, that Alex seems happy in his present foster care. Kevin's relationship with the children will be further summarized later.

In December 1993, the children were removed from Teresa's custody because a babysitter reported that mice and cockroaches were in the home, that the home was dirty, and that she had observed the children playing sexually with one another. As a result, juvenile court proceedings were had and a case plan dated

April 6, 1994, was adopted. The plan provided that Teresa was to locate an appropriate clean and safe house, to complete a drug and alcohol evaluation and its recommendations, and to notify the Department of any male companions with whom she was living. Kevin was to complete a drug and alcohol evaluation and its recommendations, undergo counseling for his anger, locate appropriate housing, notify a social worker of changed circumstances, and notify the Department of any female companion. At one time when Teresa had custody, Alex developed an infection from a dirty feeding tube. Teresa lost custody in February 1995. The case was open for almost 2 years, and at the end of 1995, the divorce decree was modified, the children were placed with Kevin, and the case was closed.

On January 14 or 15, 1997, a voluntary case plan was opened on the complaint that Carol had kicked Alex. The children were not taken from Kevin's care, but therapy was provided, and the case was closed in June 1997 when Kevin and the children moved out of Carol's home. In October 1997, the children were removed upon the complaint that Kevin had abused Heather. Stress therapy was provided. The record is unclear as to how long the children were removed from the home, but one Department worker said that it was for several months. A case plan was developed under the date of November 25, 1997, and the case continued until February 1999. The children were later removed from the home on October 21, 1998, upon a complaint of physical abuse originating from the children's school. This concerned allegations that Kevin bruised Spencer's chest and grabbed him by his ankles and that the children were scared of Kevin. A voluntary placement was established, with the children being put in foster care.

The children were next removed on July 16, 2000. The removal was prompted by the unfounded complaint that Kevin had touched Heather in an inappropriate way, but other issues emerged, and that removal developed into the present case.

A petition for adjudication was filed which alleged that Heather, Spencer, and Alex were juveniles as defined by Neb. Rev. Stat. § 43-247(3)(a) (Cum. Supp. 2002) because they lacked parental care by reason of the fault or habits of the appellants (count I) and because they were in a situation or engaged in an occupation dangerous to life or limb or injurious to their health or

morals (count II). At an October 3, 2000, adjudication hearing, the State dismissed count I and the appellants pled no contest to count II. The attorney for the State supplied the factual basis by stating that the State had evidence that on July 16, there was a boa snake in Kevin's house which was not contained and was accessible to the children of the house and that the State would have produced an expert to testify that a snake of its size could endanger children and that normally, two adults handle a snake of that size. The court adjudicated the children under § 43-247(3)(a) pursuant to the appellants' no contest pleas.

On December 13, 2000, the court adopted a proposed case plan. Its permanency objectives were for Heather to be reunited with Teresa and for Alex and Spencer to be reunited with Kevin. The plan's goals for Kevin were (1) to be totally drug and alcohol free; (2) to be able to provide the basic necessities for the children, including food, clothing, adequate housing, medical care, and appropriate daycare; (3) not to be sexually inappropriate with anyone; and (4) to use, with Carol, appropriate parenting skills around all the children. Kevin was to complete a drug and alcohol evaluation, not to be in any bar, to attend counseling to deal with stress, to find and keep a job, to set up a household where each child would have a room, to locate appropriate daycare for the children, to complete counseling, to deal with the issues of Heather's report of Kevin's sexually abusing her and Spencer's sexual contact with Heather, to remove all sexual material from the home, and to use locked doors on bedrooms. Carol was to complete a drug and alcohol evaluation in order to assess codependency issues and was to participate in recommended counseling.

Prince testified that Kevin accomplished some of the goals of the case plan. He completed the drug and alcohol evaluation but failed to talk to her about it as directed by the evaluator. He had been in a bar drinking, and he refused urinalysis tests she requested in June and September. She was told that he refused because he had been using marijuana at the time. He was employed only some of the time and was fired from jobs, and he did not provide evidence such as pay stubs. He made it clear to her that he intended to live with Carol in her house, and he failed to establish adequate sleeping facilities for Spencer. He

underwent a psychological evaluation, and he exhibited appropriate parenting skills while visiting the children.

The plan's goals for Teresa were (1) to be totally drug and alcohol free and not live with anyone who uses alcohol and drugs; (2) to be able to provide basic necessities for the children; (3) to keep a clean home, keep food in the home, set up and follow a meal schedule and chore list, and keep the home free of all adult sexual material; and (4) to use appropriate parenting skills with the children. Teresa was to complete several tasks, including completing all recommendations of her drug evaluation and moving out of the home with Junior; not to go into any bar or have drugs or alcohol in her home; to maintain full-time employment, find appropriate housing, and secure appropriate daycare and transportation for Heather; to prepare well-balanced meals; to have locks on all bedroom doors and monitor the children's contact versus sexual behavior during visits; to complete parenting classes and use the skills taught; and to attend family counseling with the children and not abuse them. Teresa underwent alcohol evaluations, and she followed their recommendations to complete a partial care program but did not go through the co-dependency program as recommended.

Prince testified that there are no further services that the Department can provide the appellants and that it was in the best interests of the children that the parental rights of the appellants be terminated. She based her opinion on the fact that the children had been removed so many times and want to be finished and done with such removals.

Prince testified that Kevin attended most of the visitation allowed him with the boys. She favored termination of parental rights because the children have been in and out of various placements for years. She believed that if the appellants' parental rights were terminated, there would not be an adoption, but, rather, the children would be left in foster homes. She opined that if a guardianship were established, the children would still "struggle with the knowledge . . . that they might go back [to the appellants' homes] because [guardianship] doesn't make a permanent placement for them." She believed that Heather had been in at least four foster homes by the time of the hearing, that Alex had been in two foster homes since July 2000, and that Spencer

had been in four foster homes. The Department has no long-term placement commitments for the children. Prince recognized that even if parental rights are terminated, there will be some contact between the appellants and the children, because in a small town, they are going to see one another. The Department was open to recommending visitation once a month for a few hours.

Michelle Walker, a psychotherapist, testified that she had worked with the children in family therapy starting in August 2000. Because the case plan projected reunification of Teresa with Heather and Kevin with the boys, Walker included Teresa with Heather's therapy and Kevin with Spencer's, along with a few sessions including Kevin, Spencer, and Alex. Walker had many sessions with the children and the appellants, particularly Kevin and, to an extent, Carol. Walker testified that Kevin's conduct during sessions was appropriate. She testified that the therapy was eventually terminated because Kevin needed to get his relationship with Carol on track; he and Carol needed to demonstrate that they could appropriately parent the children.

Walker opined that Teresa is not in a position to parent Heather because Teresa was still living with a man with "a history of criminal charges." She opined that Kevin was incapable of parenting the children. She also learned, from a telephone call from Carol and from the children via the foster parents, that Kevin had abused Carol.

The children told Walker that they loved Teresa, but they expressed concern about being around at times when she and Junior would fight. Walker opined that it was damaging to the children to have them dangling, not knowing whether or not they were going to be reunited with the appellants, and that termination of the appellants' parental rights would therefore be in the children's best interests. However, she would approve of a guardianship with the children in a permanent location with foster parents.

On July 19, 2001, the State filed a motion to terminate the parental rights of the appellants because (1) they had substantially and continuously or repeatedly neglected and refused to give the children necessary parental care and protection; (2) they were unfit by reason of debauchery, habitual use of intoxicating liquor or narcotic drugs, or repeated lewd and lascivious behavior, which

conduct was found by the court to be seriously detrimental to the health, morals, or well-being of the children; and (3) following the adjudication, reasonable efforts were made to preserve and reunify the family but failed to correct the conditions leading to the determination.

By an order filed on November 28, 2001, the court terminated Kevin's and Teresa's parental rights. In its judgment, the court made general findings that the Department under the direction of the court made repeated attempts to find a way to reunify the family. The court also summarized in detail the history of the appellants' problems, deficiencies, and shortcomings as parents. It found that the appellants "are simply incapable of properly parenting these children." The court also made a general finding that the State had proved each and every allegation of the petition to terminate by clear and convincing evidence and that termination of the parental rights was in the children's best interests. Both Teresa and Kevin have timely appealed.

## ASSIGNMENTS OF ERROR

Teresa alleges that the court committed nine errors, and Kevin alleges six. We conclude that the errors assigned and argued can be most efficiently considered when summarized and rearranged under the following organization: The court made erroneous determinations regarding (1) the admissibility of evidence of prior contacts the family had with the Department and juvenile court; (2) the case plan's validity and effect on the termination of parental rights under § 43-292(6); (3) whether the initial adjudication was valid to give the court jurisdiction; (4) the sufficiency of the evidence for termination of parental rights under § 43-292(6); (5) the sufficiency of the evidence for termination of parental rights under § 43-292(2) and (4); and (6) the sufficiency of the evidence to support a finding that termination of parental rights is in the best interests of the children as required under § 43-292.

## STANDARD OF REVIEW

■ In an appeal from an order terminating parental rights, an appellate court tries factual questions de novo on the record. Appellate review is independent of the juvenile court's findings. However, when the evidence is in conflict, an appellate court

may give weight to the fact that the juvenile court observed the witnesses and accepted one version of facts over another. *In re Interest of Ty M. & Devon M.*, 265 Neb. 150, 655 N.W.2d 672 (2003).

■ Although the Nebraska rules of evidence do not apply in dispositional hearings held in proceedings under the Nebraska Juvenile Code, the requirements of due process control determinations of the type of evidence which may be used by the State in an attempt to prove that parental rights should be terminated. See *In re Interest of Kassara M.*, 258 Neb. 90, 601 N.W.2d 917 (1999). Improper admission of evidence in a parental rights proceeding does not, in and of itself, constitute reversible error, for, as long as the appellant properly objected, an appellate court will not consider any such evidence in its de novo review of the record. *Id.*

## ANALYSIS
*Admissibility of Evidence of Prior Contacts.*

Teresa filed a motion in limine seeking to prohibit evidence regarding her involvement with the Department concerning the children prior to the year 2000. She objected on the basis that such evidence was irrelevant and immaterial. The motion was overruled because such evidence was "pertinent to the first two causes of action" (those seeking termination of parental rights under § 43-292(2) and (4)). Many objections were made during trial to preserve the issue raised by the motion in limine. During trial, the court sustained some objections to such evidence on the basis that the witness did not have proper knowledge to testify to certain aspects of the parties' history. Department caseworkers testified regarding the appellants' history, but other witnesses and even the appellants' testimony supplied some background information. Upon the basis of the authority discussed below, we conclude that at least the preadjudication information we summarize in this opinion was admissible.

In *In re Interest of Joshua M. et al.*, 251 Neb. 614, 558 N.W.2d 548 (1997), the court determined that preadjudication referrals were not relevant to determining whether a parent had complied with a rehabilitation plan after adjudication. The appellants in that case had also argued that such evidence was not relevant to a determination of whether termination of parental rights was in

the best interests of the children, but the court did not specifically address that argument. The preadjudication referral concerned the determinations by the same court immediately before adjudication. These appear to have been temporary orders and were clearly distinguishable from previous conduct of the parents which might have shed light upon the resolution of termination issues such as those in this case.

In *In re Interest of Kassara M., supra*, reports prepared by the caseworker for the court were admitted over objection, and this was approved because the caseworker testified; the reports were also admissible under the business records exception to the hearsay rule. In *In re Interest of Ty M. & Devon M.*, 265 Neb. 150, 169, 655 N.W.2d 672, 688 (2003), the court said:

> A court is not prohibited from considering prior events when determining whether to terminate parental rights . . . . See *In re Interest of P.D.*, 231 Neb. 608, 437 N.W.2d 156 (1989). "It is impossible to determine whether a plan to reunite a parent and child is reasonable without considering whether the plan is designed to correct problems which required the State's intervention in the first place. Review of prior events is essential to this determination." *Id.* at 617, 437 N.W.2d at 163.

We conclude that the historical facts we have summarized above were properly admitted under the foregoing authority.

*Validity of Adjudication.*

Teresa cites *In re Interest of Kelly D.*, 3 Neb. App. 251, 526 N.W.2d 439 (1994), in which this court decided sua sponte that there were no grounds for the adjudication and that the juvenile court therefore lacked jurisdiction for its adjudication under § 43-247(3)(a). In doing so, we were following the holding of the Nebraska Supreme Court in *In re Interest of D.M.B.*, 240 Neb. 349, 352, 481 N.W.2d 905, 909 (1992), when it said, "If the pleadings and evidence at the adjudication hearing do not justify a juvenile court's acquiring jurisdiction of a child, then the juvenile court has no jurisdiction . . . ." With this rule in mind, we believe that the adjudication procedure in this case bears a close examination.

In this case, the State alleged in the petition that the children were juveniles as defined by § 43-247(3)(a) because they "lack proper parental care by reason of the fault or habits of [their] parent[s]" (count I) and because they "are in a situation or [engage] in an occupation dangerous to life or limb or injurious to [their] health or morals" (count II). The State dismissed count I, and both of the appellants pled no contest to count II. The factual basis was given by the State's attorney, and it was as follows:

This occurred on July 16th of the year 2000, here in the County of Hall, State of Nebraska, that would be at [Kevin]'s home. We'd have evidence showing he did have a snake there. It was a boa snake. So at the time the officers went there, the snake was free and was not contained, was accessible to the children of the house[.] We would have brought experts in from the zoo to testify that the snake of that size could have endangered the child. In fact, they use two — they normally allow two adults to handle a snake of that size.

The parties also stipulated to the date of birth of each child, that Alex was handicapped with "spastic quadriplegic cerebral palsy," and that he was not confined to a wheelchair but used one as an aid in transportation.

One of the several grounds for termination of rights grouped in § 43-247(3)(a) is for a juvenile "who is in a situation or engages in an occupation dangerous to life or limb or injurious to the health or morals of such juvenile." It seems likely that a clearer factual basis could have been provided to support the notion that the presence of an unconfined large snake in the house with young children, one of whom had serious limitation of his movement, could be unsafe for the children. Kevin disputed this at the termination hearing, but not before. However, the factual basis does establish that an unconfined snake big enough to have "endangered" children was in the house, and thus, it supports a finding that the children were living in a situation dangerous to their life and limb or injurious to their health. We therefore conclude that the factual basis justified the court's findings and jurisdiction under § 43-247(3)(a) and that the juvenile court therefore acquired jurisdiction.

*Validity and Effect of Case Plan.*

Section 43-292(6) provides that a finding justifying termination may be made when, "[f]ollowing a determination that the juvenile is one as described in subdivision (3)(a) of section 43-247, reasonable efforts to preserve and reunify the family if required under section 43-283.01, under the direction of the court, have failed to correct the conditions leading to the determination." Neb. Rev. Stat. § 43-283.01(4) (Reissue 1998) states several conditions under which reasonable efforts to unify a family are not required, but in this case, there is no contention that subdivision (4) of that statute is applicable. Reasonable efforts to preserve and reunify in this case were clearly necessary.

█ The appellants allege that the trial court erred in adopting a case plan that was not designed to correct the deficiencies that led to the adjudication. They argue that the existence of an unconfined boa snake was the only ground for adjudication. Kevin gave the snake to someone in South Dakota shortly after the petition was filed. The case plan that was adopted said nothing about a snake, and the case plan was clearly directed toward the appellants' use of alcohol and drugs, lack of suitable housing, lack of cleanliness, lack of parenting skills, and possible child abuse or neglect. Assuming for the purpose of discussion that the case plan was inappropriate, the plan was nevertheless approved by the court and no appeal was taken from that order. It is clear that such orders are final and not subject to collateral attack. See, *In re Interest of Ty M. & Devon M.*, 265 Neb. 150, 655 N.W.2d 672 (2003); *In re Interest of Joshua M. et al.*, 251 Neb. 614, 558 N.W.2d 548 (1997); *In re Interest of J.H.*, 242 Neb. 906, 497 N.W.2d 346 (1993). Therefore, the terms of the plan may not be questioned in this appeal.

Closely related to the appellants' argument that the case plan was inappropriate in view of the reasons for the adjudication is the argument that § 43-292(6) is a basis for termination of rights only when reasonable efforts failed to correct a condition leading to the adjudication, that is, if the parents "have failed to correct the conditions leading to the determination" that the juvenile is one as described in § 43-247(3)(a). The appellants essentially argue that the question is whether they have failed to correct conditions in connection with the snake.

If accepted and generalized, this argument would make any condition in a plan that is deemed not to be a condition leading to adjudication immaterial. This would amount to allowing a belated collateral attack.

Kevin's counsel relies upon *In re Interest of Constance G.*, 254 Neb. 96, 106-07, 575 N.W.2d 133, 140-41 (1998), where the Nebraska Supreme Court stated:

> [T]he failure to follow a court-ordered reunification plan cannot result in termination of parental rights unless the terms of the plan are material to the situation and the basis of the adjudication. Materiality regarding such a plan exists when a parent's noncompliance results in a continued condition which was the basis for the adjudication and which is deleterious to a child expected to benefit from parental compliance with the plan. *In re Interest of J.S., A.C., and C.S.*, 227 Neb. 251, 417 N.W.2d 147 (1987).

However, we understand the Nebraska Supreme Court to have refined the effect of that broad statement. In *In re Interest of Ty M. & Devon M., supra,* the children were adjudicated because the parents had them living in an unsafe and unsanitary house. At the time of the termination hearing, the parties stipulated that the cleanliness of the home was no longer an issue. The father maintained that because the condition which brought about the proceedings had been satisfied, his rights could not be terminated on that basis. In that case, there was a series of case plans with goals for each parent to do many things besides acquire the skills to provide a clean and safe environment for the children. There were goals having to do with mental health, domestic violence, temper control, management of the children's behavior, and financial management. The court stated, "The conditions observed in the house were only a symptom of the problems which led to the adjudication and the subsequent plans for reunification." *Id.* at 164, 655 N.W.2d at 685. The recognized goal in that case was the reunification of the parents with the children, and the condition of their home was recognized as a symptom. The *In re Interest of Ty M. & Devon M.* court stated, "Once a plan of reunification has been ordered to correct the conditions underlying the adjudication under § 43-247(3)(a), the plan must be reasonably related to the

objective of reuniting the parents with the children." 265 Neb. at 163-64, 655 N.W.2d at 685.

In the case at hand, the case plan dated October 23, 2000, was objected to but was approved by the court on December 13. It recited that the chronic neglect of the children went back to 1994, and after giving background facts, it contained permanency objectives for Heather to be reunified with Teresa and for Alex and Spencer to be reunified with Kevin. We will not restate the goals or summarize the tasks each appellant was to follow, but there is no dispute that these goals were intended to reunite this family to the extent that the appellants' divorce, their individual situations, and their limitations allowed. The case plan was reasonably related to the appellants' establishing and maintaining permanent safe and wholesome homes for the children.

*Grounds for Termination Under § 43-292(6).*

In order to terminate parental rights, the State must prove by clear and convincing evidence that one of the statutory grounds for termination enumerated in § 43-292 exists and that termination is in the child's best interests. *In re Interest of DeWayne G. & Devon G.*, 263 Neb. 43, 638 N.W.2d 510 (2002). Clear and convincing evidence is that amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of a fact to be proved. *In re Interest of Constance G.*, 254 Neb. 96, 575 N.W.2d 133 (1998). Only one ground for termination under that statutory section need be proved in order to terminate parental rights. *In re Interest of Kalie W.*, 258 Neb. 46, 601 N.W.2d 753 (1999). We shall now consider those factors that the court found to have been proved.

The purpose of § 43-292(6) is to advance the best interests of the child by giving the juvenile court power to terminate parental rights where the grounds for adjudicating the child within § 43-247(3)(a) have not been corrected. *In re Interest of Joshua M. et al.*, 251 Neb. 614, 558 N.W.2d 548 (1997). The statutory language is as follows: "Following a determination that the juvenile is one as described in subdivision (3)(a) of section 43-247, reasonable efforts to preserve and reunify the family . . . under the direction of the court . . . have failed to correct the conditions leading to the determination . . . ." § 43-292(6).

The case plan for both of the appellants required that they provide for the basic necessities of the children, including food, clothing, adequate housing, and appropriate care. Clearly, neither appellant satisfied this goal. Some of the other goals were accomplished, and there could be legitimate argument on whether the appellants complied with others. But, it is clear that they failed to progress toward being able to supply a satisfactory home for the children. The appellants admit as much when they argue only for visitation. Therefore, upon our de novo review, we determine that grounds for termination of the parental rights of the appellants under § 43-292(6) have been proved by clear and convincing evidence.

### Sufficiency of Evidence for Termination Under § 43-292(2) and (4).

An appellate court is not obligated to engage in an analysis which is not needed to adjudicate the case and controversy before it. *Ray v. Argos Corp.*, 259 Neb. 799, 612 N.W.2d 246 (2000). Since we have determined that grounds for termination of parental rights exist under § 43-292(6) and since adequate proof of only one of the grounds for termination is necessary, we will not consider the sufficiency of the evidence to support termination under these grounds.

### Best Interests of Children.

The court made several findings of fact relative to the appellants' inability to maintain a home and concluded, "The bottom line is that [the appellants] are simply incapable of properly parenting these children." Otherwise, the trial court made a general finding that termination of the appellants' parental rights was in the best interests of the children. In its brief, in support of a finding that termination of parental rights is in the children's best interests, the State cites Prince's opinion that termination is in the children's best interests and her statement of the reasons for that opinion, that is, that the children have been in and out of various placements for years and that they want to be finished with such removals. In its brief, the State relies upon the statement from *In re Interest of Michael B. et al.*, 258 Neb. 545, 604 N.W.2d 405 (2000), that children cannot,

and should not, be suspended in foster care or be made to await uncertain parental maturity.

■ Prince and Walker both opined that termination of parental rights would be in the children's best interests. Prince based her opinion on the facts that the children had been removed from their home so many times and that if the appellants' parental rights were not terminated, the children would be left in foster homes struggling with the knowledge that they might go "back" to the appellants' homes. Walker also opined that dangling in foster care and not knowing whether they would be reunited with the appellants was damaging to the children and that therefore, termination would be in their best interests. Both Prince and Walker mentioned and did not exclude the possibility of a permanent guardianship. There is no evidence that the children will cease to be in foster care if the appellants' parental rights are terminated. There is no evidence that the visitation of the appellants with the children is harmful to the children. There is undisputed evidence of a positive relationship of both of the appellants with the children. The evidence is that the children were disturbed by the prospect of the appellants' parental rights' being terminated. The appellants have always exercised visitation with the children. The State's witness alluded to visitation continuing after termination. Prince testified that if a guardianship were established, the children would still "struggle with the knowledge . . . that they might go back [to the appellants' homes] because [guardianship] doesn't make a permanent placement for them." There is no evidence to support either such knowledge on the children's part or that this assertion is correct. Triers of fact are not required to take opinions of expert witnesses as binding upon them. *Anderson/Couvillon v. Nebraska Dept. of Soc. Servs.*, 253 Neb. 813, 572 N.W.2d 362 (1998).

■ Courts have frequently used the rule that "[w]here a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the best interests of the child require termination of the parental rights." *In re Interest of Kassara M.*, 258 Neb. 90, 100, 601 N.W.2d 917, 926 (1999). Where a parent is unable or unwilling to rehabilitate himself or herself, termination of parental rights is not necessarily in the best interests of the child. An observation that the Nebraska Supreme Court made many years ago is still true: The court noted that it would

be helpful if it could articulate specific standards and criteria for termination cases, but that "it becomes apparent, after just a little experience with the subject, that indeed each case must be decided upon its own facts viewed in light of its own circumstances." *In re Interest of D.*, 209 Neb. 529, 530, 308 N.W.2d 729, 730 (1981).

It would seem that any consideration of the issue of whether termination of parental rights is in the best interests of a child involves consideration of two aspects: (1) what, if anything, the child might gain or lose by a continued relationship with the parent and (2) what, if anything, the child might gain by the prospects of new relationships which the termination of parental rights might open for the child. In many termination cases, it is clear that the child stands to gain very little, if anything, by a continued relationship with the parent. In a few cases, the evidence shows that even continued visitation will possibly be harmful to the child. In the cases where adoption is a possibility, the child has the prospect of gaining a normal homelife by adoption which is not possible without the termination of parental rights of the natural parent.

In the following cases, the prospects of adoption are specifically mentioned in the opinion: *In re Interest of L.K.Y. and A.L.Y.*, 235 Neb. 545, 455 N.W.2d 828 (1990) (mother has been unable to stabilize her employment and living situation, and children were in foster care with family willing to adopt them); *In re Interest of J.S., S.C., and L.S.*, 224 Neb. 234, 397 N.W.2d 621 (1986) (parents will be unable to care for children in foreseeable future, but each child was in potentially adoptive home); *In re Interest of Marcus W. et al.*, 11 Neb. App. 313, 649 N.W.2d 899 (2002) (children did not view mentally deficient mother as caregiver, and each child was residing in adoptive placement). These cases are examples of a situation where termination is comparatively easy because the parent cannot provide a stable home but someone else is willing to do so by adopting the children. The evidence shows no likelihood of such permanency's being a possibility in the case at hand.

The following are examples of cases where the evidence showed that a continued relationship with the parent would be of no value or even harmful to the child: In *In re Interest of*

*Kassara M., supra*, the child was 7 years old and did not trust her mother, who had spent time in prison and who did not visit the child. There was no bond between the mother and the child. In *In re Interest of Joshua M. et al.*, 251 Neb. 614, 558 N.W.2d 548 (1997), the mother failed to rehabilitate herself and persisted in maintaining a relationship with a man who sexually abused the children, thus exposing them to the possibility of abuse in the future. The evidence showed that the child would deteriorate for a time after visits with the mother. In *In re Interest of B.B. et al.*, 239 Neb. 952, 479 N.W.2d 787 (1992), the mother insisted upon maintaining a relationship with two men whom she had accused of sexually abusing the children and a psychologist testified that the mother lacked insight into the seriousness of her children's suffering. In that case, the evidence showed that the children expressed a desire not to visit the parents and would get sick during or after such a visit. In *In re Interest of S.R., D.R., and D.B.*, 239 Neb. 871, 876, 479 N.W.2d 126, 130 (1992), the court called the father's suggestion that termination was not warranted because the State had not exhausted all alternatives "logically preposterous and legally frivolous." That court stated that the requirement was not that all possible alternatives be exhausted, but only that reasonable efforts had been made to reunite the child with the parent. *Id.* However, the opinion also states that the evidence showed that during visitation, the support worker observed that the father was generally passive and had to be prompted to interact with and supervise the children and that "there had been no bonding between the father and the children such that the children would be injured by termination of the father's relationship." *Id.* at 876, 479 N.W.2d at 129-30.

██ The best interests of the children are the primary consideration in determining whether parental rights should be terminated. See *In re Interest of DeWayne G. & Devon G.*, 263 Neb. 43, 638 N.W.2d 510 (2002). Section 43-292 requires clear and convincing evidence that termination of parental rights is in the best interests of the children. The problem with the State's evidence in this case is that there is no evidence of what the intended placement is if the appellants' parental rights are or are not terminated. Prince testified that in a small town, there would

continue to be some contact between the parents and the children, and that the Department would be open to recommending visitation once a month for a few hours.

By asking for visitation only, the appellants seemingly concede that the best interests of the children are served by allowing their legal and physical custody to continue with the State. Such a conclusion, however, does not necessarily mean that terminating the parental rights serves the children's best interests. We are not presented with young children; rather, the boys are now aged 14 and 15 and Heather is 12. Prince testified that she did not believe that there would be an adoption if the appellants' rights were terminated and that the children would be left in foster care. Alex is seriously handicapped. Despite all of their weaknesses, both of the appellants have a close relationship with the children.

The facts in this case are relatively unique in our experience. There is no realistic possibility that either Teresa or Kevin could succeed in having a home favorable for the children within a few years. However, in spite of several years of separation, Teresa has maintained a close relationship with the children, particularly Heather. The children lived with Kevin until they were removed in July 2000. It is of course sad that he lost custody of the children and lost his housing assistance because of an ungrounded report of abuse and that the children were adjudicated in part because of an arguably petty complaint about a snake, which situation was quickly corrected. However groundless the report against him may have been, the record indicates that Kevin no longer has the ability to reestablish a home for the children. Yet, such evidence as there is shows that he had a positive relationship with all of the children and that his visitations with them were appropriate. Kevin testified to his having helped Alex develop and improve his limited mobility. It is clear that Kevin had bonded with all three children, especially the boys. There is no evidence that would establish that the breaking of the bond between either Teresa or Kevin and any of the children would be beneficial to the respective child. Even the Department's personnel alluded to possible continued visitation. It would appear that the difference in this respect would be that if parental rights are terminated, visitation would be at the whim of the Department's personnel. We cannot see where the children's best interests would be damaged by

continued visitation. In any case, there is no evidence on the issue and the State has the burden of proof.

On the other hand, there is no evidence that the children's prospect for the future will be better if the appellants' parental rights are terminated. Insofar as the evidence is concerned, it appears that the children will remain in foster care regardless of whether the appellants' parental rights are terminated. The State's witnesses' assertions that the children will no longer be dangling in foster care if the appellants' parental rights are terminated is unexplained.

Witnesses have alluded to the possibility of the children's being placed under guardianship. While we pretend some knowledge of this State's law on the appointment and administration of guardians, there is no evidence showing how or what use could be made of these laws if the appellants' parental rights were or were not terminated. We do not think it appropriate to speculate, and the State has the burden of proof.

The evidence does not indicate that termination would change the lives of the children in any respect, except that it would sever formal parental rights, including visitation rights, and possibly visitation. The evidence therefore indicates that any beneficial bond between the appellants and the children would be cut or weakened, but the evidence does not show any possible benefit to the children that might accrue as a result of that severance or weakening. Bearing in mind that the State has the burden of proof to show that termination is in the best interests of the children, we cannot find that the State has met that burden.

While there is a vague claim that Kevin molested Heather in some undisclosed manner, that claim was ultimately unfounded. There are claims that Kevin physically abused both Heather and Spencer, but there is no claim that he did so other than while he had custody. There is evidence that both of the appellants have had drug and alcohol problems in the past, but there is no claim that they appeared at visitation in any manner affected by drugs, alcohol, or any lack of self control.

The record is also clear that the appellants, in spite of their limitations, have developed a bond of affection with the children. Absent evidence that such a bond is deleterious to the children, we are inclined to believe that such a bond is beneficial to the

children. These children are old enough that depriving them of visitation with the appellants is not going to shelter them from the appellants' faults. There is no evidence showing the effect that terminating the appellants' parental rights will have on the children or on the bonds of affection the record shows to exist between the appellants and the children. The statute requires the State to prove by clear and convincing evidence that termination is in the best interests of the children. The State's evidence on this issue is not clear and convincing.

## CONCLUSION

We conclude that at least one of the grounds that justify termination of the appellants' parental rights exists, but that the State failed to prove by clear and convincing evidence that termination of their parental rights was in the best interests of the children. Accordingly, we reverse, and remand with directions to dismiss the motion for termination.

REVERSED AND REMANDED WITH
DIRECTIONS TO DISMISS.

IRWIN, Chief Judge, participating on briefs.

IRWIN, Chief Judge, dissenting.

I respectfully dissent from the conclusion of the majority that the State has failed to demonstrate by clear and convincing evidence that termination of the appellants' parental rights is in the best interests of Heather, Spencer, and Alex. On the contrary, I would defer to the trial court regarding the factual determination of what is in the best interests of these children, and the record clearly supports the trial court's determination that their best interests will be served by terminating the appellants' parental rights.

The majority opinion appears to base the conclusion that the State failed to prove that the best interests of the children would be served by terminating the appellants' parental rights on the notion that these children are "unadoptable." Not only does such a notion lack a firm basis in the record, but it further proposes a new analysis and a new requirement for future termination of parental rights cases in this State that is not recognized by the applicable statutes and has never been recognized by an appellate court in this State previously.

The majority opinion first implies that these children are "unadoptable." This implication appears to be based on a combination of Prince's testimony that she did not believe that there would be an adoption if the appellants' parental rights were terminated and the facts that the children are all above the age of 10 and that Spencer and Alex have special needs.

The record in this case does not indicate a long-term placement commitment for the children. However, there is no requirement in existing Nebraska law that there be such a commitment to support a finding that termination of parental rights is in the best interests of the children. Similarly, there is no legal basis for concluding either that the lack of such a commitment at the time of the termination hearing or the age and special needs of the children somehow make them necessarily "unadoptable" or, more importantly, that such potential difficulties in finding a long-term commitment preclude a finding that termination of parental rights is in the best interests of these children.

The trial court was every bit as informed as this court regarding the likelihood of adoption for these children, and it had every bit as much information available when it decided that termination of the appellants' parental rights was in the best interests of the children. The trial court was presented with unrebutted testimony from two experts, Prince and Walker, both of whom provided expert opinions that termination of the appellants' parental rights was in the best interests of the children and both of whom provided rational bases for their opinions. Although the trier of fact is not required to accept the opinion of an expert, as the majority indicates, it is equally axiomatic in Nebraska case precedence that appellate courts may give weight to the fact that the trial court observed witnesses and accepted one version of facts or opinions over another. In this case, the trial court heard the testimony, in person, and chose to accept the opinions of the experts concerning the best interests of these children.

Furthermore, the record is more than adequate to support both the opinions of Prince and Walker and the trial court's ultimate conclusion that the appellants' parental rights should be terminated. The record indicates that these children have been forced to endure being in and out of foster care repeatedly over several years because of the actions, or inaction, of the appellants. There

is no dispute that the appellants have significantly failed to comply with rehabilitation plans designed to assist them in regaining their children; that neither of the appellants is now, or will be in the foreseeable future, in any position to parent these children; or that the State satisfied its burden of proving the existence of grounds for terminating the appellants' parental rights.

Indeed, the record indicates a history of behavior by the appellants that has endangered these children. This history includes allegations of physical and sexual abuse. The majority concludes that the allegations of sexual abuse were "ungrounded." Testimony at trial from the protection and safety worker who investigated the complaint establishes that a medical evaluation was performed which "could not prove that it had happened or had not happened and based on that the criminal charges were dropped." Although the worker indicated "Correct" when one of the attorneys at trial stated, "I guess I should change the word. I shouldn't say not happened, it should have been unfounded would be the proper way to put it," the record is not clear enough to hold as a matter of law that the allegations were simply "ungrounded." The record further contains allegations of Kevin's keeping an uncaged boa snake of a size large enough to endanger the children's health in the house (which allegations, contrary to the majority's opinion, the record does not indicate to be an "arguably petty" complaint), allegations of filthy living conditions, and allegations of a general inability to parent.

Although the majority in its opinion fully recognizes that the appellants are "simply incapable of properly parenting these children" and probably never will be capable to do so, the majority chooses to emphasize the fact that there is not an adoption on the horizon for these children. This emphasis is troubling because it may be seen as a new analysis regarding the determination of best interests in termination of parental rights cases. It is possible that the majority opinion may be read to suggest that the existence of a long-term placement may imply that the best interests of the children require termination of parental rights; no existing law in Nebraska has ever suggested this before. No existing law in Nebraska, statutory or judicial, has held before today that adoptability is even a consideration in determining best interests in termination cases. Even more significantly, no existing law in

Nebraska has held that the lack of evidence of an impending adoption equates to "unadoptability" or that such lack of evidence is enough to warrant reversing a trial court's conclusion on best interests, which conclusion is supported by overwhelming evidence and expert opinion. Rather, the majority opinion in the present case has now ensured that these children are, legally, "unadoptable." Their fate is now sealed.